IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| TODD LOPEZ, As Personal Representative of the Wrongful Death ESTATE OF RAYMOND GABEHART | § § § § | |
| *Plaintiff*, | § § | CIVIL ACTION NO. 6:22-cv-00826 |
| v. | § § | |
| CANTEX HEALTH CARE CENTERS II, LLC, and FARMINGTON HEALTH CARE CENTER, LTD. CO. d/b/a Cedar Ridge Inn | § § § § | |
| *Defendants*. | § | |

## DEFENDANTS' NOTICE OF REMOVAL

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that Defendants CANTEX HEALTH CARE CENTERS II, LLC, and FARMINGTON HEALTH CARE CENTER, LTD. CO. d/b/a Cedar Ridge Inn, (collectively "Defendants") hereby remove this action to this Court from the First Judicial District Court of Santa Fe County, New Mexico by filing this Notice and by filing a copy of this Notice in the First Judicial District Court of Santa Fe County, New Mexico, pursuant to 28 U.S.C. §§ 1441 and 1446, reserving all defenses and objections to venue. The grounds for removal are based on 28 U.S.C. § 1331, 28 U.S.C. § 1332, 42 U.S.C. § 247d-6d(e)(1), 28 U.S.C. § 1442(a)(1), and 28 U.S.C. § 1367. In support hereof, Defendants state as follows:

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

1. This is a proceeding in which Plaintiff alleges medical negligence, negligent hiring, training, retention, and supervision, respondeat superior, unfair practices, civil conspiracy, joint venture, and punitive damages against Defendants arising from and concerning

an alleged failure to adequately implement COVID-19 countermeasures and properly develop and follow COVID-19 precautions and protocols, resulting in Raymond Gabehart allegedly contracting COVID-19 and suffering injuries and death. (*See generally* Pl. Compl.)

2.      This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiff's Complaint for Wrongful Death asserts claims "arising under" and governed by federal law within the meaning of 28 U.S.C. § 1331. In addition, this case is removable pursuant to 28 U.S.C. § 1442(a)(1) because Defendants are being sued in connection with acts undertaken at the direction of a federal officer. Finally, the case is removable pursuant to 28 U.S.C. § 1332 on the basis of diversity jurisdiction.

3.      On September 16, 2022, Plaintiff Todd Lopez, as Personal Representative of the Wrongful Death Estate of Raymond Gabehart, filed a Complaint for Wrongful Death in the First Judicial District Court of Santa Fe County, New Mexico, Case Number D-101-CV-2022-01677 ("State Court Action").  A true and correct copy of Plaintiff's Complaint for Wrongful Death is attached hereto as Ex. C.  The State Court Action is on of multiple cases that were filed against the same Defendants on or about September 16, 2022.  All such cases are being removed to federal court on the same bases.

4.      Defendants' removal is timely under 28 U.S.C. § 1446(b) as it is being filed within 30 days of service of the Complaint upon Defendants, which both received service on October 4, 2022.

5.      In accordance with 28 U.S.C. §1446(a) and Local Rule 81, a true and correct copy of all of the process and pleadings filed in the State Court Action to date, along with a copy of the Civil Docket Sheet, are collectively attached to this notice as Ex. A-J.

6.     This Notice of Removal is being filed in the United States District Court for the District of New Mexico, the District Court of the United States within which the State Court Action is pending, as required by 28 U.S.C. §§1441(a) and 1446(a).

7.     This case is being removed from the First Judicial District Court of Santa Fe County, New Mexico. Pursuant to 28 U.S.C. § 1446(d), Defendants will promptly serve a copy of this Notice of Removal upon counsel for the Plaintiff and will promptly file a copy of the same with the District Clerk of the First Judicial District Court of Santa Fe County, New Mexico.

8.     In accordance with Local Rule 81.1, Defendants provide the following index of all documents filed in the state court action:

> Exhibit A – Petition to Appoint Personal Representative
> Exhibit B – Amended Petition to Appoint Personal Representative
> Exhibit C – Complaint for Wrongful Death
> Exhibit D – Plaintiff's Jury Demand
> Exhibit E – Order on the Amended Petition to Appoint Personal Representative
> Exhibit F – Summons for Defendant Farmington Health Care Center, Ltd. Co.
> Exhibit G – Summons for Defendant Cantex
> Exhibit H – Certificate of Service
> Exhibit I – Certificate of Service
> Exhibit J – State Court Docket Sheet

9.     In accordance with Local Rule 3.1 of this Court, Defendants attach with this Notice of Removal a completed civil cover sheet.

10.    Accordingly, Defendants have satisfied all procedural requirements governing removal pursuant to 28 U.S.C. §§ 1441 and 1446, the Federal Rules of Civil Procedure, and the Local Rules of this Court.

11.    By filing this Notice of Removal, Defendants do not waive any rights or defenses which may be available to Defendants.

12.    All fees required by law in connection with this notice have been filed by Defendants.

## PLAINTIFF'S ALLEGATIONS AND CLAIMS IN THE COMPLAINT

13.    Plaintiff's Complaint alleges Defendants failed to adequately implement COVID-19 countermeasures and properly develop and follow COVID-19 plans, precautions and protocols, resulting in Raymond Gabehart allegedly contracting COVID-19 and suffering injuries and death.  *See* Ex. C, at ¶¶ 15-21.

14.    Plaintiff frames his claims against Defendants as medical negligence, negligent hiring, training, retention, and supervision, respondeat superior, unfair practices, civil conspiracy, joint venture, and punitive damages.  *See* Ex. C, at ¶¶ 22-86.

15.    Plaintiffs' claims arise out of, relate to, or result from Defendants' response to the COVID-19 pandemic and their use, administration and allocation of personal protective equipment ("PPE"), testing equipment, safety equipment, infection control measures, and other countermeasures, as well as their related decision-making, in an attempt to prevent or mitigate the spread of COVID-19.

## GROUNDS FOR REMOVAL

16.    This case is removable under 28 U.S.C. § 1332 based on the existence of complete diversity between the parties. This is an action in which the District Court of the United States has original jurisdiction under the provisions of 28 U.S.C. § 1332, in that diversity of citizenship exists between Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

17.    This case is also removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiff's Complaint assert claims "arising under" federal law within the meaning of § 1331, as Plaintiff's allegations invoke the exclusive federal jurisdiction of the Court and the immunities from suit and liability promised in the PREP Act. *See* 42 U.S.C. §

247d-6d(e) (exclusive federal cause of action and exclusive federal jurisdiction for claims arising from the alleged administration and use of a COVID-19 countermeasure), (a)(1) and (b)(8) (immunity from suit and liability under state and federal law, and preemption of state law)).

18.    This case is further removable under 28 U.S.C. § 1442(a)(1) on the basis of Federal Officer Jurisdiction as Defendants have been sued for acts undertaken at the direction of a federal officer.

19.    Finally, removal is further afforded under federal question jurisdiction pursuant to the *Grable* doctrine and 28 U.S.C. § 1441(a) as the claims presented pose a substantial federal issue. *See Grable & Sons Metal Prods. V. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

### I.    Removal Based on Diversity Jurisdiction

#### A.    Citizenship of Parties

20.    There is complete diversity between Plaintiff and Defendants.  A corporation is a citizen of its state of incorporation and the state where its principal place of business is located." *Grynberg v. Kinder Morgan Energy Partners, LP*, 805 F.3d 901, 905 (10th Cir. 2015). A limited liability company ("LLC") is a citizen of each state or foreign country of which any of its members is a citizen. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015).   When the members of a limited liability company are themselves "unincorporated associations such as additional LLCs or limited partnerships, the citizenship of the LLC party is determined by a complete upstream analysis of its organizational structure." *See SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 1022 (N.D. Okla. 2017) (*citing Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt., LLC*, 692 F.3d 42, 49 (2d Cir. 2012)). For individual members of a limited liability company, "state citizenship is equivalent to domicile." *Smith v. Cummings*, 445 3d 1254, 1259–60 (10th Cir. 2006). An individual establishes a

"particular state" as his or her domicile by being "physically present in the state" with an "inten[t] to remain there." *Id.*

21.     Complete diversity exists here based on the citizenship of the parties.

22.     As shown in Plaintiff's Complaint, Plaintiff Todd Lopez is an individual and resident of Santa Fe County, New Mexico.

23.     Defendant Farmington Health Care Center Ltd. Co. d/b/a Cedar Ridge Inn is a Limited Company with a sole member: Defendant Cantex Health Care Centers II, LLC.

24.     Sole Member Defendant Cantex Health Care Centers II, LLC is a Limited Liability Company with the following members:

    a.  Medcare Mgmt. Holdings, Inc.

    b.  Bratex, Inc.

    c.  Gotex Investments, Inc.

    d.  Grant Koch Robb Investments, Ltd.

    e.  Concord Wood Investments, Ltd., and

    f.  LB Belon, LLC

25.     Medcare Mgmt. Holdings, Inc. is a citizen of Texas (its state of incorporation and state of its principal place of business).

26.     Bratex Inc. is a citizen of Texas (its state of incorporation and state of its principal place of business).

27.     Gotex Investments, Inc. is a citizen of Texas (its state of incorporation and state of its principal place of business).

28.     Grant Koch Robb Investments, Ltd. is a citizen of its members, Diane Gran Koch, Bert A. Grant, Suzanne Robb, and Crestview Investment Corporation.

    a.   Diane Gran Koch's residence and domicile are in Canada.

    b.   Bert A. Grant's residence and domicile are in Canada.

    c.   Suzanne Robb's residence and domicile are in Canada.

    d.   Crestview Investment Corporation is organized and maintains its principal place of business in Canada.

29.    Concord Wood Investments, Ltd. is a citizen of its members, Janet Farano, Charles Gambin, Richard Gambin, and Mary Iacobelli.

    a.   Janet Farano's residence and domicile are in Canada.

    b.   Charles Gambin's residence and domicile are in Canada.

    c.   Richard Gambin's residence and domicile are in Canada.

    d.   Mary Iacobelli's residence and domicile are in Canada.

30.    LB Belon, LLC is a citizen of its members, Joseph Bell and Peter Longo.

    a.   Peter Longo's residence and domicile are in the State of New York.

    b.   Joseph Bell's residence and domicile are in the State of New York.

31.    None of the owners listed in the foregoing Paragraphs 24-30 are citizens of New Mexico.

32.    As such, all Defendants are diverse from the Plaintiff as no Defendant is a resident of New Mexico for removal purposes based on diversity of citizenship.

**B. Amount in Controversy**

33.    Although allegations in the Complaint may be sufficient to establish the amount in controversy for diversity-jurisdiction purposes, district courts are not confined to the Complaint and may rely on other evidence as well. *McPhail v. Deere & Company*, 529 F.3d 947, 956 (10th Cir. 2008). The Court of Appeals in *McPhail* explained that the defendant has the

initial burden to establish, by a preponderance of the evidence, "jurisdictional facts that ma[k]e it possible that $75,000 [i]s in play." *Id*. at 956. If the defendant makes such a showing, then "the case stays in federal court unless it is legally certain that the controversy is worth less than the jurisdictional minimum." *Id*. (*citing Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536, 540-43 (7th Cir. 2006)). This court set out in *Wiatt v. State Farm Insurance Companies*, 560 F. Supp. 2d 1068, 1075 (D.N.M. 2007) the computation of and specific types of damages which may be considered:

> In determining whether the amount in controversy exceeds $75,000.00, a court may aggregate actual damages, punitive damages, attorney's fees, and statutorily imposed penalties. *See Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1217-18 (10th Cir. 2003). Costs and interest, however, are excluded. *See* 28 U.S.C. § 1332(a). Punitive damages may be considered if they are recoverable as a matter of governing substantive law and then plaintiff presents some factual evidence of entitlement to punitive damages. *See Larkin v. Brown*, 41 F.3d 387, 388-89 (8th Cir. 1994); *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir. 1990); *J.W. Petroleum, Inc. v. Lange*, 787 F. Supp. 975, 976 (D. Kan. 1992). Attorney's fees may be considered if a contract provides for them or if a statute mandates or allows their payment. *See Miera v. Dairyland Ins. Co*., 143 F.3d 1337, 1340 (10th Cir. 1998); *Building Erection Serv. Co. v. Ceco Corp*., 760 F. Supp. 188, 189 (D. Kan. 1991). Statutorily imposed penalties and damages may also be considered in assessing whether the amount-in-controversy threshold has been met. *See St. Paul Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998).

34.    This Court in *Brown v. Guscott*, No. CV 02-0858 JP/ WWD, 2002 WL 35649673, at *3 (D.N.M. Sept. 30, 2002) stated that to determine of whether the amount in controversy exceeds $75,000, the Court:

> "may consider the substance and nature of the injuries and damages described in the pleadings, ... or even a plaintiff's refusal to stipulate or admit that he or she is not seeking damages in excess of the requisite amount. The Court may also consider if the notice of removal states a good faith belief that the amount in controversy exceeds $75,000." (citations omitted).

35.    Although Defendants dispute that Plaintiff is entitled to recover any damages, Defendants in good faith believe the amount in controversy exceeds $75,000 because it is

apparent from the face of the Complaint that Plaintiff seeks recovery of an amount in excess of $75,000, exclusive of costs and interest. In short, Plaintiff alleges that the Defendants provided negligent healthcare to Mr. Gabehart while he was a resident of the Cedar Ridge Inn facility, resulting in his death. Plaintiff seeks, without limitation, Mr. Gabehart's damages under the Wrongful Death Act, actual damages, compensatory, punitive damages, treble damages, and attorney's fees.

36. The Court can reasonably conclude that the amount in controversy could easily exceed $75,000.00. A court may consider comparable jury verdicts where shown to be factually similar to the case at bar. *Varela v. Wal-Mart Stores, East, Inc*., 86 F. Supp. 2d 1109, 1112 (D.N.M. 2000). Wrongful death judgments alone in the state of New Mexico illustrate that the amount in controversy is over $75,000. *See Keith v. ManorCare, Inc*., 2009-NMCA-119, 147 N.M. 209, 211, 218 P.3d 1257, 1259 (awarding $53.2 million in a wrongful death action where a nursing home resident died as a result of negligent treatment of nursing staff); *Grassie v. Roswell Hosp. Corp., 2011-NMCA-024, 150 N.M. 283, 258 P.3d 1075, 1079* (awarding $1.9 million compensatory damages and $20 million in punitive damages in wrongful death suit where the hospital emergency room staff was found to be medically negligent in the death of a 78 year old man); *Sandoval v. Gurley Properties Ltd*., 2022-NMCA-004, ¶ 3, 503 P.3d 410, 413, *cert. denied* (Dec. 27, 2021) (awarding damages of $18 million in a suit alleging breaches of the standard of care and wrongful death against hospital and other parties related to patient's death from a pulmonary embolism following treatment for injuries sustained in a fall).

37. Moreover, United States District Court of New Mexico has found that cases with similar allegations to those here have satisfied the $75,000 amount-in-controversy requirement. *See, e.g., Jerry Erwin Assocs., Inc. v. Est. of Asher by & through Zangara,* 290 F. Supp. 3d 1213,

1246 (D.N.M. 2017) ("Given these allegations of medical negligence, it is not legally certain that the stakes of the arbitration are $75,000 or less. **It is difficult to imagine a wrongful death claim for less than $75,000**.") (emphasis added).

38.     Further, a plaintiff's "claim for punitive damages alone makes it virtually impossible to say that the claim is for less than the jurisdictional amount" even though compensatory damages may be less than $75,000.  *Woodward v. Newcourt Commercial Fin. Corp.,* 60 F. Supp. 2d 530, 532 (D.S.C. 1999).  To the extent Plaintiff alleges an entitlement to recover attorney's fees, "a reasonable estimate may be used in calculating the necessary jurisdictional amount in a removal proceeding based upon diversity of citizenship." *Miera v. Dairyland Ins. Co.,*143 F.3d 1337, 1340 (10th Cir. 1998). While Defendants dispute that Plaintiff is entitled to recover attorneys' fees, a reasonable estimate of fees and costs required to take this case through trial itself exceeds $75,000.

39.     As such, it is facially apparent that Plaintiffs' claims exceed $75,000 and diversity jurisdiction exists here.

## II.     The PREP Act Provides for Complete Preemption

40.     "When [a] federal statute completely preempts [a] state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003). *Beneficial* provides that state claims may be removed to federal court in two circumstances: (1) when Congress expressly provides; or (2) when a federal statute wholly displaces the state-law cause of action. *Id*. The PREP Act wholly displaces state-law causes of action for claims related to a covered person's use, misuse, nonuse or allocation of countermeasures to combat a pandemic by creating an exclusive federal remedy for those claims involving both an administrative and

judicial component. 42 U.S.C. §247d-6e; §247d-6d(d)(e). This remedial structure was purposefully established by Congress and is explicitly "exclusive of any other civil action or proceeding for any claim or suit [the PREP Act] encompasses ...." 42 U.S.C. §247d-6e(d). Accordingly, Plaintiffs' allegations of state law causes of action clearly bring their claims within the purview of the PREP Act and mandate complete preemption. *See* Memorandum Ruling in *Rachal v. Natchitoches Nursing & Rehab Center LLC*, Civil Docket No. 1:21-CV-00334 (W.D. La. April 30, 2021), at fn. 3, discussed *infra*; *see also* Order Regarding Plaintiffs' Motion to Remand and Defendant's Motion to Dismiss the Complaint in *Garcia v. Welltower OpCo Group, LLC*, No. 8:20-cv-02250-JVS-KESx (C.D. Cal. Feb. 10, 2021), at p. 10, discussed *infra*.

### A.  PREP Act Application to the COVID-19 Pandemic

41.    The PREP Act, which is a component of the Public Health Services Act ("PHSA"), 42 U.S.C. § 201, *et seq*., grants healthcare providers and other covered persons immunity from claims for injuries related to the use of approved countermeasures to combat a national public health emergency, such as the COVID-19 pandemic. Congress' goal was to enable healthcare providers, including nursing facilities like the one sued herein, to focus on using every available means to combat a pandemic and save lives without being chilled in their efforts by the threat of lawsuits. *See* 42 U.S.C. § 247d-6d.

42.    The PREP Act is triggered when the Department of Health and Human Services ("HHS") Secretary issues a declaration defining the scope and breadth of PREP Act protections relevant to a particular public health emergency. *See* 42 U.S.C. § 247d. The PREP Act provides that when a "disease or other health condition or other threat to health constitutes a public health emergency," the Secretary of Health and Human Services (HHS) may issue a

declaration "recommending[]…the manufacture, testing, development, distribution, administration, or use of one or more covered countermeasures" against the disease. *Id.* When such a declaration issues, "covered persons" who administer or use "covered countermeasures" become "immune from suit and liability under Federal and State law with respect to *all claims for loss caused by, arising out of, relating to, or resulting from* the administration to or the use by an individual of a covered countermeasure" as defined by the Secretary of HHS. 42 U.S.C. § 247d-6d(a)(1) (emphasis added).

43.    A "covered person" includes a person or entity that "is a qualified person" or a "program planner". 42 U.S.C. § 247d–6d(i)(2)(B). A "qualified person" is defined as a "licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed." 42 U.S.C. § 247d–6d(i)(2)(B)(iv). A "program planner" is defined as "a State or local government, including…a person employed by the State or local government, or other person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under subsection (b)." 42 U.S.C. § 247d– 6d(i)(6).  Further, the PREP Act defines a "person" as "an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state or local government agency or department." 42 U.S.C. § 247d–6d(i)(5).

44.     Congress also explicitly wrote preemption into the PREP Act, stating that "no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that is different from, or is in conflict with, any requirement applicable under this section" and relates to, among other things, use or administration of the covered countermeasure. 42 U.S.C. § 247d-6d(b)(8)(A)-(B).

45.     In addition, Congress provides two exclusive federal remedies in the PREP Act for individuals with claims for loss arising out of the use of covered countermeasures. First, the Act creates a "Covered Countermeasure Process Fund" for purposes of "providing timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure." 42 U.S.C. § 247d-6e(a). Claimants can receive compensation from this Fund by applying for benefits through the Countermeasures Injury Compensation Program. *See* 42 C.F.R. §§ 110.1-110.100. Second, an injured person may bring "an exclusive Federal cause of action" under the PREP Act "against a covered person for death or serious physical injury proximately caused by willful misconduct." 42 U.S.C. § 247d-6d(d)(1). The PREP Act sets forth specific procedures that govern lawsuits asserting this cause of action. *Id*. at § 247d-6d(e).

46.     The PREP Act was triggered for COVID-19 when the HHS Secretary issued a declaration on March 17, 2020, announcing that, as of February 4, 2020, "[l]iability immunity as prescribed in the PREP Act…is in effect" for any "[a]ctivities authorized in accordance with the public health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency" related to COVID-19. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg.

15,198, 15,201-02 (Mar. 17, 2020), amended by 85 Fed. Reg. 21,012 (Apr. 15, 2020) (the "Declaration").

47.    In that Declaration, the term "administration" is defined, extending beyond the physical distribution of COVID-19 countermeasures to the "management and operation of countermeasure programs as well as the management and operation of locations for [the] purpose of distributing and dispensing countermeasures." *See* 85 Fed. Reg. 15202.

48.    The Declaration also broadly defines "covered countermeasure" as:

> Covered Countermeasures are any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product. Covered Countermeasures must be "qualified pandemic or epidemic products," or "security countermeasures," or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the FD&C Act, and the Public Health Service Act.

85 Fed. Reg. 15198.

49.    The Declaration was subsequently amended to add respiratory protective devices to the list of covered countermeasures. *See* 85 Fed. Reg. 21012, 21013.[1]  On June 8, 2020, the Declaration was amended again to reflect HHS's initial intent to "identify the full range of qualified countermeasures" as permitted under the PREP Act. 85 Fed. Reg. 35100, 35101.

50.    HHS also issued Advisory Opinions regarding the Declaration. On April 17, 2020, HHS issued an Opinion recognizing the broad, preemptive nature of the Declaration. *See* Ex. K,

---

[1] The Secretary issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020. The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act. On June 4, 2020, the Secretary further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. *See* 85 FR 21012.

April 17, 2020 HHS Advisory Opinion. The Opinion states that "immunity covers claims for loss sounding in tort or contract" and "PREP Act immunity must be read in light of the PREP Act's broad, express-preemption provision." *Id.* at p. 2.

51.     Additionally, on October 23, 2020, HHS issued "Advisory Opinion 20-04 on the Public Readiness and Emergency Preparedness Act and Secretary's Declaration Under the Act, confirming that "administration" under the PREP Act is much broader than the mere physical provision of a countermeasure to a recipient and encompasses activities related to the "management and operation" of COVID-19 countermeasure programs and those facilities that provide countermeasures to recipients. *See* Ex. L, Advisory Opinion 20-04. This Advisory Opinion flatly rejects as "wrong" a pre-pandemic New York trial court ruling in *Casabianca v. Mt. Sinai Medical Center*, 2014 WL 10413521 (New York Co. December 12, 2014), that the PREP Act requires the "direct physical" administration of a COVID-19 countermeasure and that the Act is not applicable to claims involving an omission or failure to act.

52.     On December 3, 2020, the HHS Secretary issued the Fourth Amendment to the Declaration ("Amendment Four") (published at 85 Fed. Reg. 79190 (Dec. 9, 2020)), which, *inter alia*:

      a.  Expressly adopts all COVID-19 Advisory Opinions into its initiating Declaration, giving those directives controlling authority over interpretations of the PREP Act; *Id.* at 79191, 79192, 79194-95;

      b.  Declares that an omission to administer a covered countermeasure can fall within the PREP Act's protections; *Id.* at 79191, 79194, 79197; and

      c.  Makes explicit that cases involving COVID-19 covered countermeasures are to be in the federal system provided by Congress and that this "federal jurisdiction" is essential to the uniform provision of a national response to the COVID-19 pandemic; *Id*. at 79194, 79196, 79197-98.

*See* 85 Fed. Reg. 79190.

53.     Amendment Four also addresses HHS's authority as explicitly directed by Congress, to define the application of the PREP Act by stating: "42 U.S.C. 247d-6d(b)(7) provides that '[n]o court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection.'" *See* Amendment Four, at 26 n. 25. Therefore, the Secretary's Declaration – including all its amendments and the Advisory Opinions incorporated therein – are controlling as directed by Congress in section (b)(7)   Also, where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *Chevron, Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984).

54.     On January 8, 2021, HHS published another Advisory Opinion of the Office of General Counsel addressing questions raised by the Fourth Amendment. *See* Advisory Opinion 21-01 on the Public Readiness and Emergency Preparedness Act Scope of Preemption Provision, Jan. 8, 2021 ("AO 21-01), attached hereto as Ex. M, Advisory Opinion 21-01. AO 21-01 confirms that the PREP Act is indeed invoked by allegations that include not only "use" or administration of countermeasures, but alleged failure to act or inaction, where the non-use was the result of conscious decision-making.  *See Rachal,* p. 12, attached hereto as Ex. N (concluding that "HHS's interpretation of the PREP Act and its scope [as set forth in AO 21-01] is reasonable" and, moreover, warrants deference given: "(i) the PREP Act's broad grant of authority to the HHS Secretary; (ii) the Secretary's express incorporation of the OGC's Advisory Opinions into the Declarations for purposes of construing the PREP Act; (iii) the complexity of the relevant statutory provisions; (iv) the technical nature of the subject matter; and (v) the need for uniformity in the judiciary's interpretation of the PREP Act across the United States.").

55.     AO 21-01 also states that "[t]he PREP Act is a 'Complete Preemption' Statute," because it establishes both a federal and administrative cause of action as the only viable claim and vests exclusive jurisdiction in federal court. *Id.* at 2.

**B.    Congress Provides for Complete Preemption in the PREP Act Under** *Beneficial*

56.     Congress intended to regulate national responses to pandemics. The PREP Act expressly satisfies the *Beneficial* test of preemption in stating that "a covered person shall be **immune from suit and liability** under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." §247d-6d(a)(1) (emphasis added); *see also* (b)(8) ("during the effective period of a declaration...no State...may establish, enforce, or continue in effect any provision of law or legal requirement that—is different from...any requirement applicable under this section"). The PREP Act further provides that this immunity "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure…or use of such countermeasure." § 247d-6d(a)(2)(B). HHS has instructed time and again that this preemption is to be given the broadest possible application.[2]

57.     Significantly, the PREP Act also provides an extensive claims and litigation process for COVID-19 claimants in accordance the directives of *Beneficial* by providing for federal redress and displacing state-law liability. Specifically, the PREP Act establishes a pre-

---

[2] HHS refers **eight times** to the broad applicability of preemption of state law claims. *See* Advisory Opinion 21-01 (Jan. 8, 2021), at p. 1, Advisory Opinion 20-04 (Oct. 23, 2020), Advisory Opinion 20-02 (May 19, 2020), at p. 4–5, Advisory Opinion 20-01 (Jan. 8, 2020), at p. 2.  HHS refers  **six times** to the broad applicability of immunity from state law claims. *See* Advisory Opinion 20-04 (Oct. 23, 2020), at p. 1–2, and Advisory Opinion 20-01 (Jan. 8, 2020), at p. 2, 4, 7.

litigation no-fault monetary fund for those injured by the use or administration of covered countermeasures that must be exhausted prior to relief under the federal civil claims process (§247d-6e(a), (d)(1)), requiring an exclusive federal remedy for all claims related to countermeasures (§247d-6e(d)(5)), and providing a Federal cause of action as the single exception to immunity (§247d-6d(d)(1)).

### C.    The New Administration Reaffirms PREP Act Provides Complete Preemption

58.    Consistent with its predecessor, the new Administration in 2021 reaffirmed that the PREP Act provides for complete preemption of COVID-19 state law claims. On January 28, 2021, HHS amended the Declaration for the fifth time again asserting that HHS Advisory Opinions are incorporated into the original Declaration. *See* Fifth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration, (Jan. 28, 2021), 86 Fed. Reg. 7872, 7874 (stating "[t]he plain language of the PREP Act makes clear that there is complete preemption of state law.").

59.    There have also been three additional amendments further confirming that the preemptive effect of the PREP Act, with the sixth on February 16, 2021, the seventh on March 16, 2021, and the eighth on August 4, 2021. *See* 86 Fed. Reg. 9516 (Feb. 16, 2021), 86 Fed. Reg. 14462 (Mar. 16, 2021), and 86 Fed. Reg. 41977 (Aug. 4, 2021) (dated July 30, 2021 and retroactive to Mar. 11, 2021).

60.    In addition to these HHS authorities, the U.S. Department of Justice ("DOJ") filed a Statement of Interest ("SOI") of the United States in *Bolton v. Gallatin Center for Rehabilitation & Healing, LLC*, No. 3:30-cv-00683 (M.D. Tenn. Jan. 19, 2021) at Docket No. 35, which constitutes the official position of the United States' interest in the enforcement

of the PREP Act, stating, *inter alia,* that the PREP Act "completely preempts claims relating to the administration or use of covered countermeasures with respect to a public health emergency." Further, it states that the two key provisions of the PREP Act – the immunity provision for all Federal and state law claims, and the exclusive alternative remedy provision, established as the sole exception to immunity – operate together to demonstrate the PREP Act's completely preemptive nature. *Id.* The DOJ also noted that the PREP Act is crucial to the "whole-of- nation response" to public health emergencies (which depends on cooperation among private- sector partners and state and local officials across the nation) and "sweeping" immunity was granted to encourage such cooperation. *Id.*

61.    On February 10, 2021, the U.S. District Court for the Central District of California specifically invoked AO 21-01 to deny a motion for remand in an action against a nursing home which alleged failure to adequately use PPE and COVID countermeasures, holding that "the PREP Act is a complete preemption statute ... [and] an adequate basis for federal question jurisdiction exists." *See Garcia v. Welltower OpCo Group LLC*, No 8:20-cv-02250-JVS-KESx, 2021 U.S.Dist. LEXIS 25738, at *24 (C.D. Cal. Feb. 10, 2021). The Court further found that the allegations of the complaint fell squarely within the scope of the PREP Act:

> Plaintiffs' injuries "aris[e] out of, relat[e] to, or result[] from the administration to or the use by an individual of a covered countermeasure." *See* 42 U.S.C. § 247d-6d(a)(1). For example, the FAC details infection control measures and procedures including symptom checking, staff monitoring and screening, and limiting visitation ....In other places, the FAC directly draws upon the use (and in some case, misuse) of PPE .... The FAC also details screening measures employed by [Defendants] related to certain professional services provided within the facility. These allegations of use and misuse of PPE and the infection control measures directly relate to covered countermeasures within the meaning of the PREP Act.

*Id.*, at *21.

62.     Subsequently, the District Court for the Western District of Louisiana also agreed that the PREP Act is a complete preemption statute, finding that the PREP Act confers federal jurisdiction and completely preempts claims falling within its scope because it includes: 1) a civil enforcement provision that creates a cause of action that both replaces and protects the analogous area of state law; 2) a specific jurisdictional grant to the federal courts for enforcement of the right; and 3) a clear Congressional intent that claims brought under the federal law be exclusive. *See Rachal, supra*, Ex. N, at fn. 3. *See also Reilly v. Delta Healthcare II, LLC*, et. al, No: 8:21-cv-1013-JSM-JSS (M.D. Fla. June 7, 2021), and *Branch v. Lilac Holdings, LLC*, No. 21-cv-00605-BAS-MDD (S.D. Cal. June 16, 2021) (both courts conceding applicability of PREP Act where senior living facilities have moved to dismiss claims based on the immunity and other protections provided therein).

### D.    Plaintiff's Claims Fall Within the Purview of the PREP Act

63.     Here, based on the face of the Complaint, the totality of the allegations made therein and the logical impact of its most central allegations -- a failure to properly use countermeasures to care for Mr. Gabehart which led to her contraction of COVID-19 and death -- the PREP Act is implicated by Plaintiff's claims against Defendants as a "covered person" engaged in "recommended activities" under the Act. 42 U.S.C.A. §247d–6d(a)(1).

64.     Defendant Cedar Ridge Inn is a "covered persons" as contemplated by 42 U.S.C. § 247d–6d and as confirmed by the August 14, 2020 HHS Advisory Opinion in that is a "qualified person" and "program planner" under 42 U.S.C.A. § 247d-6d(i)(2)(B). Defendant Cedar Ridge Inn was acting as a "qualified person" because it is a healthcare provider authorized to administer and/or use FDA approved medical devices, such as face masks, to prevent or mitigate the spread of COVID-19. 42 U.S.C. § 247d-6d(i)(8). Defendant Cedar Ridge Inn was

also acting as a "program planner" that managed, supervised and administered the infection control and COVID-19 specific programs in the treatment of COVID-19 patients, under which covered countermeasures, including, but not limited to, the use of face masks and other personal protective equipment, visitation restrictions, infection control procedures, and screening requirements, at its facility in an effort to prevent and mitigate the spread of COVID-19 to its residents during the pandemic. *See Rachal, supra*, at pp. 9-10 (finding nursing homes are "covered persons" under the PREP Act).

65.     Plaintiff has alleged claims involving a "covered activity" relative to a "covered countermeasure." Specifically, Plaintiff alleges Defendants failed to properly care for Mr. Gabehart, leading to his contraction of COVID-19 at the defendant facility and subsequent death as a result of complications with COVID-19.  *See* Ex. C, generally, and ¶¶ 15-21, and 24-25. More specifically, Plaintiff's claims arise out of, relate to, and result from Defendant's administration use, misuse, and allocation a of countermeasures – and its decisions relating thereto – in treating, diagnosing, curing, preventing, or mitigating COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, including but not limited to PPE, sanitation measures, and quarantining.  42 U.S.C. § 247d-6d(a)(1).  *See Garcia*, at 13-14 ("Plaintiffs' [allegations] disclose possible unsuccessful attempts at compliance with federal or state guidelines – something which the PREP Act, the Declaration, and the January 8, 2021 advisory opinion cover."). These allegations thus cause this action to fall squarely under the definition of use and "administration" thereby invoking the PREP Act.  Thus, Plaintiffs' claims in the Complaint are within the scope of the PREP Act and completely preempted.

### III.     Federal Question Jurisdiction Exists Under *Grable* Doctrine

66.     Federal jurisdiction also exists where an action "arises under" federal law and raises a substantial federal issue, actually disputed and substantial. *See Grable*, 545 U.S. at 312.

67.     HHS, by and through its Fourth Amended Declaration and Advisory Opinion 21-01, confirms that the PREP Act confers a separate, independent grounds for federal question jurisdiction under the *Grable* doctrine. *See* AO 21-01 at pp. 4–5, discussing *Grable*, 545 U.S. at 312. Advisory Opinion 21-01 states that "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court." *Id*. at p. 5. HHS provides that "there are substantial federal legal and policy…interests within the meaning of [the *Grable* doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities." *Id.* (quoting 85 Fed. Reg. at 79, 197).

68.     HHS further states that: "Congress delegated to [the Secretary] the authority to strike the appropriate Federal-state balance with respect to particular covered countermeasures through PREP Act declarations." HHS's interpretation of *Grable* is consistent with the Supreme Court's long-standing rule "that in certain cases federal question jurisdiction will lie over state law claims that implicate federal issues." *Grable*, 545 U.S. at 312. "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.*

69.     The *Grable* court determined that there is no single test for determining whether an embedded federal issue exists, but that, in general, a two-step process determines whether a state law claim "arises under" federal law: (1) the state law claim must necessarily raise a stated federal issue that is actually disputed and substantial; and (2) federal courts must be able to

entertain the state law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities." 545 U.S. at 314; *see also Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986).

70.     Here, both prongs are satisfied. First, Plaintiff brings claims relating to Defendants' alleged failures in the use and administration (of covered countermeasures in connection with the care and treatment of Mr. Gabehart, which failures they specifically alleges resulted in his COVID-19 infection and which therefore necessarily implicate disputed and substantial federal issues. *See* § 247d-6d.  Second, as confirmed by Advisory Opinion 21-01 and the HHS Declaration (and its amendments), the PREP Act expresses a clear intention to supersede and preempt state control of the very issues raised by Plaintiff, i.e., issues concerning Defendants' conscious decisions when and how to use or administer (or not) covered countermeasures, including COVID-19 testing and monitoring equipment, drugs, PPE and diagnostic testing. Indeed, both the *Rachal* and the *Garcia* courts have found HHS's interpretation of the PREP Act to be reasonable and warrant deference. *Garcia*, p. 5 No. 8:20-cv-02250, Ex. N - *Rachal*, pg. 11.

71.     A substantial and disputed federal issue regarding the application of the PREP Act to Plaintiff's claims therefore necessarily exists and must be resolved by this Court to ensure the uniform and appropriate application of the PREP Act. The federal legal and policy issues described in the Fourth Amended Declaration and the HHS Advisory Opinions control and authorize this Court to retain this action under *Grable*.

### IV.     Federal Question Jurisdiction Exists Because Defendants Acted Pursuant to a Federal Officer

72.     Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the

general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila*., 790 F.3d 457, 466 (3d Cir. 2015). Removal is appropriate under 28 U.S.C. § 1442(a)(1) when: (1) defendants are persons; (2) defendants were acting under the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) there is causal nexus between the plaintiff's claims and defendants' actions under federal direction; and (4) defendants have raised a colorable defense based upon federal law. *Goncalves v. Rady Children's Hosp*., 865 F.3d 1237, 1244 (9th Cir. 2017).

### A.    Defendants Acted Under the Direction of a Federal Officer

73.    After the outbreak of COVID-19 in the United States, the federal government declared that healthcare providers such as Defendants were "critical infrastructure" businesses that were obligated to aid the federal government in preventing the spread of the virus during this unprecedented national emergency by following the federal government's direction under its close supervision.[3]

74.    Designating these businesses' activities as "critical infrastructure" enabled the federal government to enlist the aid of these private parties to ensure the continued operation of the healthcare infrastructure that is "so vital to the United States that [its] incapacity or destruction . . . would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). And when the federal government instructed these private parties on how to carry on their "critical" business during this national emergency, it enlisted them to carry out the duty of the government

---

[3] *See* Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, CISA.gov, *available at* https://www.cisa.gov/sites/default/files/publications/CISA-Guidance-on-Essential-Critical-Infrastructure-Workers-1-20-508c.pdf (last visited June 3, 2021).

itself to ensure the continued provision of "services critical to maintaining the national defense, continuity of government, economic prosperity, and quality of life in the United States." *Id.*; 42 U.S.C. § 5195c(b)(3).

75.    Indeed, the federal government enlisted nursing facilities, including senior living communities, in its efforts to fulfill the government's task of ensuring that facilities such as Defendant Cedar Ridge Inn could assist in the safe transfer and admission of patients between healthcare facilities during an unprecedented national crisis. Thus, Defendants acted "to assist, or to help carry out, the duties or tasks of the federal superior," by helping the federal government "fulfill [these and] other basic governmental tasks" that otherwise "the Government itself would have had to perform." *Watson v. Philip Morris Cos*., 551 U.S. 142, 152 (2007).

76.    Also, during the COVID-19 crisis, there has been a nationwide PPE shortage. FEMA worked closely with businesses designated as "healthcare/public health" critical infrastructure to address the need for PPE and other critical supplies to continue operations in accordance with CDC guidance. Congress also expressly approved and supported the pervasive new role of the federal government in overseeing the operation of "critical infrastructure" skilled nursing homes and assisted living communities by allocating additional funding to such healthcare providers under the CARES Act to accommodate critical ongoing operations in view of the pandemic.

77.    Since the pandemic began, through the federal directives issued by the CDC, CMS and others, federal authorities have been explicitly guiding operational decisions related to clinical pandemic response in skilled nursing facilities. As just a few examples, facilities were

ordered to restrict visitation, cancel communal dining, and implement active screening and staff for fever and respiratory symptoms.[4]

78.     Facilities were also instructed on, among other things, which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, how to mitigate staff shortages including when to permit COVID-19 positive but asymptomatic staff to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19.

79.     The United States Supreme Court has held that the phrase "acting under" involves "an effort to assist, or help carry out, the duties or tasks of the federal superior." *Watson* 551 U.S. at 152; *see In re Commonwealth's, supra*, at 457. The "acting under" requirement is broad and is also to be liberally construed. *Watson* at 147. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3rd Cir. 2016). Detailed regulation to compel specific conduct satisfies the second requirement. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998).

80.     "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Cf. Bakalis v. Crossland Savings Bank*, 781 F. Supp. 140, 144-145 (E.D.N.Y. 1991); *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947 (E.D.N.Y. 1992); *See Fung v. Abex, Corp.*, 816 F. Supp. 569, 572

---

[4] *E.g.,* Ctrs. For Medicare & Medicaid  Servs., *COVID-19 Long-Term Care Facility Guidance* (Apr. 2, 2020); Ctrs. For Disease Control & Prevention, *Strategies for Optimizing the Supply of Facemasks* (updated Mar. 17, 2020); CDC, *Using Personal Protective Equipment* (updated Aug 19, 2020); Exec. Order No. 20-009, *In Re: Suspension of Statutes, Rules, and Orders Pursuant to Executive Order Number 20-52, Made Necessary by the COVID-19 Public Health Emergency*; Exec. Order No, 20-52, *Emergency Management-COVID-19 Public Health Emergency*.

(N.D. Cal. 1992). The "acting under" requirement is met when a defendant is acting pursuant to detailed and ongoing instructions from a federal officer. *Winters, supra*, 149 F.3d. 387 (5th Cir. 1998).

81.    *Fields v. Brown*, No. 6:20-cv-00475, 2021 WL 510620 (E.D. Tex. Feb. 11, 2021) is persuasive. In pertinent part, the court in *Fields* held that a Tyson Foods facility was "acting under" the direction of a federal officer because Tyson Foods "exhibited 'an effort to help assist, or carry out, the duties and tasks'" of the federal government by "working directly with the Department of Agriculture and the [Food Safety and Inspection Service] to guarantee that there was an adequate food supply" during the COVID-19 pandemic. *Id.* at *3 (citation omitted). In holding that federal officer removal was appropriate, and that the Tyson Foods plant did in fact "act[] under" the direction of a federal officer in continuing its meatpacking operations, the court rejected plaintiffs' argument that Tyson Foods merely "communicated with federal regulators and that Tyson Foods was subject to federal regulation." *Id.* Rather, the court relied on the additional facts pled by Tyson as outcome determinative: *inter alia*, ". . .the critical-infrastructure designation. . ." of Tyson Foods' meatpacking plant, the fact that the "Department of Agriculture and the [Food Safety Inspection Service] closely monitored Tyson Food's meatpacking plants, staffing some employees onsite," and "Congress even allocated additional funding to [the Food Safety Inspection Service] to ensure that they had the resources to adequately supervise meatpacking plants like that one at issue. . ." *Id.*

82.    Here, Defendants similarly satisfy the first element for federal officer removal because, as part of the country's critical infrastructure, Defendants acted at all relevant times "to assist, or to help carry out, the duties or tasks of the federal superior," by helping the federal government "fulfill other basic governmental tasks" that otherwise "the Government itself would

have had to perform," *Watson*, 551 U.S. at 153-54. In the instant matter, healthcare providers were identified as part of the "critical infrastructure" of the United States – like defendants in *Fields* – thereby obligating them to aid the Federal Government's in connection with the pandemic. As part of the nation's critical infrastructure, Defendants thus have had a special relationship with the federal government during the pandemic and have acted under their direction in their response to the COVID-19 pandemic and their treatment of Decedent, with reporting requirements and risks of penalty for any failures to follow the government's directions.

**B. Causal Nexus Exists Between Plaintiff's Claim and the Actions Taken by Defendants Pursuant to Federal Direction**

83.     Defendants also satisfy the "nexus" or "causation" requirement for federal officer jurisdiction, which requires that the alleged conduct have been undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *In re Commonwealth's,* 790 F.3d at 471. *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (Congress "broadened federal officer removal to actions, not just causally connected, but alternatively connected or associated, with acts under color of federal office."

84.     Here, Plaintiff's claims easily satisfy the "minimal 'causal connection'" requirement. *Latiolais*, 951 F.3d at 295 (*quoting Willingham v. Morgan*, 395 U.S. 402, 409 (1969), and *Jefferson Cty. v. Acker,* 527 U.S. 423, 432-33 (1999)). Plaintiff's Complaint alleges a deficiency in Defendants' actions taken in response to federal directives in working to combat and mitigate the spread of the virus and in caring for Mr. Begay during pandemic. Thus, there is a clear causal nexus between Plaintiff's claims and the actions taken by Defendants pursuant to federal direction during this global health crisis.

## C.  Defendants Have a Colorable Defense Based on Federal Law

85.    For purposes of removal, Defendants must present a colorable defense based on federal law:  the defense must only be "colorable," and need not be "clearly sustainable," as the purpose for the removal statute is to assure that the validity of the defense is tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court;" for this reason, the Supreme Court has "rejected a narrow, grudging" approach when analyzing whether a defendant had raised a colorable federal defense. *Jefferson Cty.,* 527 U.S. at 431. A defendant need only show it has a plausible federal defense. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012). Defendants assert a federal defense in this case—namely, immunity and preemption under the PREP Act for its administration and use of "covered countermeasures" in caring for decedent during the pandemic.  In doing so, Defendants satisfy the "colorable federal defense" element of the federal officer removal statute.

86.    Accordingly, as *Fields* recognized, federal court is the proper forum for this case because Defendants were "acting under the direction of multiple federal agencies" as part of the federal "critical-infrastructure designation" "since [the declaration of a national emergency on] March 13, 2020," *Fields,* 2021 WL 510620, at *3 & n.1, and Defendants exhibited "an effort to help assist, or carry out, the duties and tasks of the federal superior." *Watson,* 551 U.S. at 152.

## CONCLUSION

This case is removable to the U.S. District Court for the District of New Mexico under 28 U.S.C. § 1332 based on the existence of complete diversity between the parties.  Further, through the PREP Act, Congress manifested its intent to completely preempt state law with respect to claims that invoke or involve PREP Act immunity and to create an exclusive federal remedy for

such preempted claims. Plaintiff's claims against Defendants clearly fall within that category and are, thus, completely preempted for purposes of federal question jurisdiction and are removable under 28 U.S.C. § 1441(a). Separately, Plaintiff's claims are removable under § 1442(a)(1) because they arise out of the actions Defendants undertook at the direction of the federal government, and this Court therefore maintains jurisdiction over this case.

Respectfully submitted,

By: _/s/ Frank Alvarez_____
   **FRANK ALVAREZ**
   NM Bar No. 27610
   frank.alvarez@qpwblaw.com

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
1700 Pacific Avenue, Suite 4545
Dallas, Texas  75201
(214) 754-8755  (Telephone)
(214) 754-8744  (Telecopier)

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 1st day of November, 2022, a true and correct copy of the foregoing document was served in compliance with the Federal Rules of Civil Procedure upon all counsel of record, as indicated below:

Joshua K. Conaway
Aaron K. Thompson
Noe Astorga-Corral
Fadduol, Cluff, Hardy & Conaway, P.C.
3301 San Mateo Boulevard NE
Albuquerque, NM  87110
Telephone:  (505) 243-6045
jconaway@fchclaw.com
athompson@fchclaw.com
nastorga-corral@fchclaw.com

-and-

Nichole Henry
Whitener Law Firm PA
4110 Cutler Avenue NE
Albuquerque, New Mexico 87110-3896
Telephone:  (505) 242-333.
Facsimile:  (505) 242-3322
nichole@whitenerlaw.com
*Counsel for Plaintiffs*

*/s/ Frank Alvarez*_____
**FRANK ALVAREZ**